# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

PAUL HOLMES,

                    Plaintiff,

        v.                                    Case No. 18-CV-1791

ANDREW M. SAUL,
Commissioner of Social Security,

                    Defendant.

# DECISION AND ORDER

## 1. Procedural History

Plaintiff Paul Holmes alleges that he has been disabled since June 22, 2015. (Tr. 19.) In September 2015 he applied for disability insurance benefits. (Tr. 168-69.) After his application was denied initially (Tr. 56-64) and upon reconsideration (Tr. 66-81), a hearing was held before an administrative law judge (ALJ) on September 14, 2017 (Tr. 34-54). On December 27, 2017, the ALJ issued a written decision concluding Holmes was not disabled. (Tr. 19-29.) The Appeals Council denied Holmes's request for review on October 17, 2018. (Tr. 1-3.) This action followed. All parties have consented to the full

jurisdiction of a magistrate judge (ECF Nos. 5, 7), and this matter is now ready for resolution.

## 2. ALJ'S Decision

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity. The ALJ found that Holmes "did not engage in substantial gainful activity during the period from his alleged onset date of June 22, 2015 through his date last insured of September 30, 2017[.]" (Tr. 22.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1522(a). The ALJ concluded that Holmes "[has] the following severe impairments: obesity, diabetes mellitus, depression, and personality disorder[.]" (Tr. 22.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 4, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 416.1526, 416.920(d), and 416.926) (called "The Listings"). If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve-month duration requirement, 20 C.F.R. § 416.909, the claimant is disabled. If the

claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. The ALJ found that Holmes "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.…" (Tr. 22.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), "which is [the claimant's] 'ability to do physical and mental work activities on a regular basis despite limitations from her impairments.'" *Ghiselli v. Colvin*, 837 F.3d 771, 774 (7th Cir. 2016) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)). In making the RFC finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-4p. In other words, the RFC determination is a "function by function" assessment of the claimant's maximum work capability. *Elder v. Astrue*, 529 F.3d 408, 412 (7th Cir. 2008). The ALJ concluded that Holmes has the RFC

> to perform medium work as defined in 20 CFR 404.1567(c) except [Holmes] cannot climb ladders, ropes, or scaffolds. [Holmes] can occasionally kneel and crawl, and occasionally be exposed to fumes. [Holmes] can perform simple, routine, tasks, with simple, occasional public interaction.

(Tr. 24.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1526, 416.965. Holmes's past relevant work was as a companion and office

helper. (Tr. 27.) The ALJ concluded that Holmes "[is] unable to perform past relevant work[.]" (*Id.*)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering his RFC, age, education, and work experience. At this step the ALJ concluded that, "considering [Holmes]'s age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [Holmes] could have performed[.]" (Tr. 28.) In reaching that conclusion, the ALJ relied on testimony from a vocational expert (VE), who testified that a hypothetical individual of Holmes's age could perform the requirements of occupations such as a cleaner, machine operator, and hand packager. (*Id.*) After finding that Holmes could perform work in the national economy, the ALJ concluded that he was not disabled. (Tr. 29.)

### 3. Standard of Review

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial evidence." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (quoting *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)). "The court is not to 'reweigh evidence, resolve

conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder*, 529 F.3d at 413).

### 4. Analysis

Holmes argues that the ALJ erred by (1) not properly evaluating his mental limitations; (2) giving little weight to the opinion of Carol Meverden, MSW; (3) not properly evaluating his physical limitations; and (4) not properly evaluating his symptoms. (ECF No. 13.)

#### 4.1. Mental Limitations

The ALJ found that Holmes suffered from the severe impairments of depression and personality disorder. (Tr. 22.) He found a moderate limitation "[i]n understanding, remembering, or applying information[;]" mild limitations "[i]n interacting with others" and "[w]ith regard to concentrating, persisting, or maintaining pace[;]" and no limitation in "adapting or managing oneself." (Tr. 23.) The ALJ opined that "[t]he severity of the claimant's mental impressions, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04 and 12.08." (*Id.*) The ALJ stated that he considered the opinions of the state agency medical consultants, which would include

Dr. Stacey Fiore. (Tr. 27.) Holmes argues that, given the RFC assessment, the ALJ "neglected to review or weigh the opinion of [State agency psychologist Stacey Fiore]." (ECF No. 13 at 10-11.)

### 4.1.1.   Ability to Handle Detailed Instructions

At step five of the sequential evaluation process the ALJ relied on testimony from the VE, who testified that a hypothetical individual of Holmes's age, education, work experience, and RFC could perform the requirements of cleaner, machine operator, and hand packager. (Tr. 28.) All three jobs require unskilled work and a specific vocational preparation level (SVP) of 2. (*Id.*) According to Holmes, "[t]he [Dictionary of Occupational Titles] explains that jobs that demand Reasoning Development Level 2 require the employee to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.'" (ECF No. 13 at 11 (footnote omitted).)

Holmes argues that the ALJ erred by not considering Dr. Fiore's opinions about Holmes's ability to handle detailed instructions. Dr. Fiore opined that Holmes was "markedly limited" in his "ability to understand and remember detailed instructions" and in his "ability to carry out detailed instructions." (Tr. 77.) But the VE opined that Holmes could perform jobs that require Reasoning Development Level 2. (ECF No. 13 at 11 (footnotes omitted); Tr. 28.) Holmes argues that his inability to follow detailed instructions or understand and remember these instructions would preclude him from performing the positions of hand packager or machine operator, and "[t]he ALJ's failure

to address Dr. Fiore's opinion regarding [his] ability to handle detailed instructions was not harmless error." (ECF No. 13 at 12.)

The Commissioner responds to this argument by stating that "courts within the Seventh Circuit (and in other Circuits) have found that a limitation to simple, unskilled work—as the ALJ did here—is not inconsistent with work involving a Reasoning Development Level 2." (ECF No. 18 at 4.) *See, e.g.*, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (finding a claimant who was restricted to "simple" work could still perform jobs that were at the General Educational Development reasoning level of three).

In reply, Holmes states that "[t]he Commissioner misunderstands Plaintiff's argument, and does not cite any cases that state that a *marked* limitation in understanding and remembering detailed instructions, and an inability to remember detailed or complex information, is consistent with Reasoning Development Level 2." (ECF No. 20 at 2 (emphasis in original).)

Besides limiting Holmes to "simple, routine, tasks," the RFC assessment does not mention Holmes's ability to handle detailed instructions. "An ALJ has the obligation to consider all relevant medical evidence.…" *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The ALJ erred by finding that Holmes was capable of performing jobs that required him to carry out detailed instructions without reconciling that finding with Dr. Fiore's opinion that Holmes was markedly limited in this area. On remand, the ALJ should consider Dr. Fiore's opinion regarding Holmes's inability to handle detailed instructions.

### 4.1.2. Limitations in Concentration, Persistence, and Pace

Holmes also argues that the ALJ erred by not addressing his limitations in concentration, persistence, and pace—specifically, by not including these limitations in the hypothetical to the VE. (ECF No. 13 at 12-13.) The Commissioner responds by arguing that the hypothetical presented to the VE had even greater limitations than what Dr. Fiore opined. (ECF No. 18 at 5.) The Commissioner states, "Dr. Fiore's opinion was entirely consistent with the ALJ's hypothetical and his mental RFC determination because [Dr. Fiore] concluded that [Holmes] was capable of sustaining concentration, persistence, attention, and pace for simple, routine tasks over the course of a normal workday or workweek with normal supervision." (*Id.* at 6.)

The ALJ must "orient the VE to the totality of a claimant's limitations. Among the limitations the VE must consider are deficiencies of concentration, persistence and pace." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). The ALJ found that Holmes had a mild limitation "[w]ith regard to concentrating, persisting, or maintaining pace…." (Tr. 23.) However, he did not include this limitation in the hypothetical he presented to the VE. Although the ALJ might be able to present the limitation using words other than "concentration, persistence, and pace," depending on the nature of the claimant's limitation, *see Cihlar v. Berryhill*, 706 F. App'x 881, 883 (7th Cir. 2017), he failed to do so here.

The ALJ's hypothetical included, in relevant part, limitations to light work with "only occasional decisional making," "only occasional changes in the work setting," and a limitation "to the performance of simple, routine and repetitive tasks." (Tr. 51-52.) These limitations were insufficient to account for deficiencies in concentration, persistence, and pace. *See, e.g., Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015) ("[W]e have repeatedly rejected the notion that a hypothetical like the one here 'confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.'") (quoting *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014); citing *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008); *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004)).

Because the ALJ found a mild limitation as to concentration, persistence, and pace, it was error to omit that limitation from the hypothetical posed to the VE. Limiting Holmes to "simple, routine and repetitive tasks" did not capture the limitation. As such, on remand the ALJ shall ensure that Holmes's mild limitations in concentration, persistence, and pace are incorporated into the hypothetical questions posed to the VE and in the RFC.

### 4.1.3. Additional Supervision

Holmes argues that the ALJ further "erred in evaluating Dr. Fiore's opinion because he did not address Mr. Holmes's need for additional supervision." (ECF No. 13

at 13.) Dr. Fiore opined that Holmes had a moderate limitation in his "ability to sustain an ordinary routine without special supervision." (Tr. 77.) She opined that, with normal supervision, Holmes would only be "able to maintain attention, concentration, persistence, and pace for simple, routine tasks, for two hours at a time, over a normal workday/week.…" (Tr. 78.) The Commissioner argues that "Dr. Fiore's narrative opinion is entirely consistent with the ALJ's mental RFC and the hypothetical posed to the vocational expert." (ECF No. 18 at 6.)

As Holmes argues, Dr. Fiore was not the only medical source who opined that Holmes would need additional supervision. Dr. Luzi stated,

> [Holmes's] history suggests difficulty with self-initiative and assuming responsibility. He presents a self-view of being somewhat inept and unable to function adequately without others' assistance, support and sense of purpose. He lacks confidence in his abilities and would be expected to be passive and anxious when faced with decisions. Organization is not his strong suit. He appears to respond best to structure and direction.

(Tr. 437.) And although she is not a medical source, Meverden testified that, in training Holmes for his job with Derco Aerospace, he required "over a month of constant one-on-one training" before he was able to work by himself. (Tr. 476.) After he started working on his own, someone from the placement management team still reviewed his work and had to meet with him to discuss his mistakes. (*Id.*) "[Holmes] would become angry with whoever was working with him" but eventually started producing accurate work. (*Id.*)

The ALJ did not include in either his hypothetical to the VE or in his RFC assessment any mention of Holmes's ability to maintain attention and concentration with

normal supervision. "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt*, 758 F.3d at 857.

In speaking about Holmes's work history, the ALJ stated,

> Mentally and physically, [Holmes] has a significant, competitive work history at several different jobs. He lost his job at a law firm when his position was eliminated, and he worked as a personal care aid for his girlfriend until her death. Most recently, he was assigned to work through a work assistance program.

(Tr. 26.) Even though "an ALJ need not mention every piece of evidence," it is still necessary that "he builds a logical bridge from the evidence to his conclusion." *Denton*, 596 F.3d at 425 (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)). The ALJ omitted any reference to how much supervision was required for Holmes "'to do physical and mental work activities on a regular basis despite limitations from [his] impairments.'" *Ghiselli*, 837 F.3d at 774 (quoting *Moore*, 743 F.3d at 1121). It was error to characterize someone who requires additional supervision in training and in accurately completing his work as having a "significant, competitive work history."

Accordingly, on remand, the ALJ should address Holmes's need for additional supervision.

### 4.1.4.  Social Limitations

Holmes next argues that the ALJ erred by not considering Dr. Fiore's opinion about Holmes's social limitations. (ECF No. 13 at 13-14.) Dr. Fiore found that Holmes was

markedly limited in his "ability to interact with the general public," moderately limited in his "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," and "can tolerate *superficial* interactions with coworkers and supervisors while completing simple tasks." (Tr. 78 (emphasis added).) The ALJ opined that Holmes had only a mild limitation in interacting with others (Tr. 23) and could have "simple, *occasional* public interaction." (Tr. 24 (emphasis added).) To support his finding that Holmes had only a mild limitation in interacting with others, the ALJ stated,

> [Holmes] reported having one friend, who was also his neighbor and had accompanied him to his consultative examination appointment. He also reported having some acquaintances at the Grand Avenue Club. He had been in a long-term relationship for 22 years before his girlfriend passed away. [Holmes]'s neighbor described [him] as a "sweetheart of a man" who got along well with others in his building. Therefore, the undersigned found [Holmes] had only mild limitation in this functional area.

(Tr. 23.)

"'Occasional contact' goes to the quantity of time spent with the individuals, whereas 'superficial contact' goes to the quality of the interactions." *Wartak v. Colvin*, No. 2:14-CV-401-PRC, 2016 WL 880945, at *7 (N.D. Ind. Mar. 8, 2016). The ALJ's explanation for finding only a mild limitation in interacting with others describes both the quality of Holmes's social interactions (i.e., he had a longtime girlfriend and knows his neighbors) and the quantity (i.e., he was in a relationship for twenty-two years). Because the ALJ articulated valid reasons for limiting Holmes to "simple, occasional public interaction" and did account for Dr. Fiore's opinion, the court finds no error.

Holmes also argues that the ALJ erred by finding that Holmes could only have "simple, occasional interaction with the public" but then omitting "simple" in the hypotheticals posed to the VE, asking about someone who could "have only occasional interaction with the public."(ECF No. 13 at 14-15.) Because "[t]he limitation of 'simple interaction' was not included in the hypotheticals," Holmes argues, "[i]t is unclear if an individual who was limited to simple, occasional interaction could satisfy the demands of the jobs identified by the VE." (*Id.* at 15.)

The Commissioner responds by arguing that, "[i]f [Holmes] was doing only 'simple, routine, and repetitive tasks' then any occasional interaction with the public would be based on or part of those 'simple, routine, and repetitive tasks.'" (ECF No. 18 at 8.) However, there is a difference between being limited to performing simple tasks and being limited to having simple interactions with others. Without explaining how limiting Holmes to performing simple tasks encompassed limiting him to simple interactions with others, the ALJ failed to build a logical bridge between the evidence and his conclusion. Accordingly, on remand the ALJ should include the limitation of "simple interaction" in his hypothetical to the VE.

### 4.2. Opinion Evidence

Holmes next argues that the ALJ did not properly consider the opinion of the program coordinator at the Grand Avenue Club, Carol Meverden, MSW. (ECF No. 13 at 15-17.) The Grand Avenue Club is an organization that helps place and train individuals

with mental illnesses in transitional employment. (Tr. 475.) Meverden worked with Holmes for about eighteen months as one of his placement managers. (*Id.*) The ALJ permitted Meverden to submit a written statement to the court following Holmes's hearing. (Tr. 37-38.)

Meverden described the various placements Holmes had and the difficulties he encountered. (Tr. 475-76.) In describing his placement as a cleaner with First Baptist Church of West Allis, Meverden wrote,

> In February 2016 we placed him in a cleaning position at 1st Baptist Church of West Allis for 12 hours a week. The church is very accommodating, allowing people to work at a slower pace. It usually takes us a week to train people. We spent 2 weeks with Paul. He had difficulty remembering the lay out of the church and the sequence of his duties. He also appeared to be winded and we worried that the job was too physical. Since Paul had no other income he was very motivated to keep the job. He later confessed he had trouble standing for that long and often had to sit during his shift.

(Tr. 475.) In describing his placement as a scanner with Derco Aerospace, Meverden wrote,

> We normally spend a week training individuals. After a week Paul was not making headway learning the job. He couldn't remember the steps needed to open the program and the steps to complete the documentation. He didn't seem to comprehend what the job was about. We spent another 2 weeks with little progress.
> …
> After over a month of constant one-on-one training we began letting him work on his own. One of the placement management team stopped in and reviewed all his work. He made mistakes such as mislabeling documents, attaching the wrong documents, and not attaching documents while recording he had done so. The next day we would go over with him his mistakes. Compounding the problem was that he couldn't comprehend his

mistakes. He would become angry with whoever was working with him. Slowly he did get to a point where his work was accurate.

(Tr. 475-76.) Meverden also stated, "We could not see how he could be competitively employable." (Tr. 476.)

> The ALJ gave Meverden's opinion "little weight," explaining,
>
> Ms. Meverden described significant work related limitations, including physical limitations during his cleaning job as well as confusion with his job and layout of the church. She further described confusion and the inability to be trained in an unskilled job. The undersigned finds that these statements are inconsistent with the remainder of the record, which found few if any physical limitations. Further, [Holmes]'s consultative examination demonstrated he was capable of following basic instructions and would be capable of carrying out simple tasks. Therefore, the undersigned gave this opinion little weight.

(Tr. 26-27 (internal citations omitted).) Although Meverden is not a medical source, given her role as program coordinator at the Grand Avenue Club, the ALJ still considered her letter as evidence. *See* 20 C.F.R. § 404.1513(a)(4).

The ALJ's explanation for giving Meverden's opinion "little weight"—its inconsistency with the opinion of consultative examiner Dr. Mary Kay Luzi—is not supported by substantial evidence. Dr. Luzi opined that "[Holmes's] ability to withstand routine work stresses and adapt to changes is judged to be moderately limited at this time because of his depressed mood, impaired morale, weak organizational skills, and reduced threshold for frustration and becoming mentally overwhelmed." (Tr. 438.) She also stated that "Mr. Holmes has mild limitation in his ability to understand, remember and carry out simple instructions." (*Id.*) These opinions are consistent with Meverden's

observations of Holmes's difficulties being trained to learn new skills and his confusion with the layout of the church at his cleaning job.

Accordingly, the ALJ erred by giving only "little weight" to the opinion of Meverden, as substantial evidence does not support the ALJ's decision. On remand, the ALJ shall reevaluate her opinion in light of the evidence in the record as a whole.

### 4.3. Physical Limitations

Holmes next contends that the ALJ did not properly evaluate his physical limitations. (ECF No. 13 at 17-21.) The ALJ stated,

> There was little evidence of record regarding physical limitations for [Holmes]. [Holmes] has diabetes and he is obese, but he still reported activities, such as working as a cleaner and walking to the library that demonstrated he was capable of physical activity. At one point, [Holmes] reported chest pain, but it was not worsened by his rigorous cleaning activity, and he denied any shortness of breath. Therefore, the undersigned finds [Holmes] is capable of medium work.

(Tr. 26.)

Holmes asserts that the ALJ "failed to properly evaluate the opinion of [his] treating physician [Dr. Walter Fuhr] or Mr. Holmes's obesity and did not adequately assess [his] statements about his limitations." (ECF No. 13 at 17-18.) Holmes further argues the ALJ "failed to incorporate all of [his] limitations in his hypothetical to the vocational expert." (*Id.* at 18.)

The Commissioner responds by stating that the ALJ explained his reasoning for not giving more weight to Dr. Fuhr's opinion and sufficiently discussed Holmes's obesity.

(ECF No. 18 at 13-15.) Moreover, any "difference between the hypothetical the ALJ presented and the ultimate RFC the ALJ set forth in his decision regarding [Holmes]'s ability to climb ladders, ropes, or scaffolds" is not a ground for remand. (*Id.* at 16.)

### 4.3.1.  Dr. Fuhr

Dr. Fuhr was Holmes's treating physician for eighteen months. (Tr. 348.) He filled out two forms for Holmes, one entitled "Medical Source Statement of Ability to Do Work-Related Activities" (Tr. 348-49), and another entitled "Diabetes Mellitus Residual Functional Capacity Questionnaire" (Tr. 350-53). On the first form Dr. Fuhr stated that Holmes could sit for four to six hours in a workday, stand/walk for two hours, never lift fifty pounds and rarely lift twenty-five pounds, and would need to avoid humidity/wetness. (Tr. 348-49.) On this form Dr. Fuhr did not state that Holmes would need unscheduled breaks, walking breaks, or leg elevation (Tr. 349), but on the second form he stated that every ninety minutes Holmes would need to walk for fifteen minutes, will have to take an unscheduled break every sixty minutes, and should elevate his legs to sixty degrees (Tr. 351-52). The ALJ gave Dr. Fuhr's opinion "little weight." (Tr. 27.)

While "[a]n ALJ must offer good reasons for discounting a treating physician's opinion," *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations and citation omitted), courts will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (citing *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010)). "While internal

inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion," the ALJ must still "adequately articulate his reasoning for discounting [the treating physician]'s opinion." *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (citing *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)) (internal citation omitted).

While noting the "long treatment relationship" between Dr. Fuhr and Holmes, the ALJ stated that "there is little support in the record for the extent of Dr. Fuhr's limitations." (Tr. 27.) Specifically, the ALJ stated that "there is no objective support that [Holmes] would need to elevate his feet, would need to get up and walk around periodically, or would need to avoid humidity. Rather, this is a checklist type of opinion, which did not include any objective support of these limitations." (*Id.*)

Supporting Dr. Fuhr's opinion is objective evidence that Holmes was obese, often referenced in the record as "morbid obesity" or "morbidly obese." (*See* Tr. 61, 62, 74, 76, 307, 385, 387, 407, 416, 426, 435, 444, 445, 446, 447, 456, 464, 465.) "Obesity can cause functional limitation....An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling....The ability to tolerate extreme heat, humidity, or hazards may also be affected." SSR 02-1p[1]. At the initial level, Dr. Syd Foster noted Holmes's complaints of back and leg pain and stated, "[i]t is reasonable to attribute these complaints [to] his obesity and the overall stress this puts on body/joints." (Tr. 62.) And at the reconsideration level, his "leg

---

[1] SSR 02-1p was rescinded and replaced on May 20, 2019 by SSR 19-2p.

swelling" was noted. (Tr. 72.) His leg swelling was also noted by another doctor, Dr. Ahmet Umit Demirciolglu, who instructed him to make a follow up appointment with Dr. Fuhr. (Tr. 418.) Because objective medical evidence of Holmes's obesity and its effects supports Dr. Fuhr's opinions, the ALJ did not adequately support his conclusion that Dr. Fuhr's opinion deserved "little weight."

Accordingly, on remand the ALJ shall reevaluate Dr. Fuhr's opinion in light of all the evidence in the record. If the ALJ decides that Dr. Fuhr's opinions are still only entitled to "little weight," he shall give good reasons supported by the record for discounting them.

### 4.3.2. Obesity

As noted throughout the record, Holmes is obese, with a BMI of 52.74. (Tr. 357, 361.) Pursuant to SSR 02-1p, in effect at the time of the ALJ's decision, there are three levels of obesity. "Level III, termed 'extreme' obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40." SSR 02-1p. Holmes argues that the ALJ did not adequately evaluate his obesity. (ECF No. 13 at 17-19.)

"An ALJ must factor in obesity when determining the aggregate impact of an applicant's impairments." *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012) (citing *Martinez v. Astrue*, 630 F.3d 693, 698-99 (7th Cir. 2011); *Clifford*, 227 F.3d at 873). And, "while obesity is no longer a standalone disabling impairment, the ALJ must still consider

its impact when evaluating the severity of other impairments." *Stephens v. Berryhill*, 888

F.3d 323, 328 (7th Cir. 2018). However, "an ALJ's failure to explicitly consider an

applicant's obesity is harmless if the applicant did not explain how her obesity hampers

her ability to work." *Stepp*, 795 F.3d at 720 (quoting *Dornseif v. Astrue*, 499 F. App'x 598,

600 (7th Cir. 2013))

> The ALJ stated,
>
> Social Security Ruling 02-1p requires Administrative Law Judges to consider obesity in determining whether claimants have medically determinable impairments that are severe, in determining whether those impairments meet or equal any listing, and finally in determining the residual functional capacity. The Clinical Guidelines issued by The National Institutes of Health define obesity as present in general where there is a body mass index ("BMI") of 30.0 or above. BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m$^2$). We generally will rely upon the judgment of a physician as to whether an individual is obese. Here, the claimant's BMI is 52.74.
>
> As indicated in SSR 02-1p, obesity may have an adverse impact upon co-existing impairments. For example, obesity may affect the cardiovascular and respiratory systems, making it harder for the chest and lungs to expand and imposing a greater burden upon the heart. Someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone. In addition, obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an eight-hour day, five-day week or equivalent schedule. These considerations have been taken into account in reaching the conclusions herein.

(Tr. 22 (internal citations omitted).) The ALJ later stated, "[Holmes] has diabetes and he

is obese, but he still reported activities, such as working as a cleaner and walking to the

library that demonstrated he was capable of physical activity." (Tr. 26.)

Holmes testified that he struggles to stand for long amounts of time and that his legs become numb. (Tr. 41.) Holmes also testified that he walks to the library, but it is next to his house, only a half block away. (Tr. 44, 434.) As such, the fact that Holmes could walk to the library is not evidence that he did not suffer from any severe physical impairments.

Furthermore, the program coordinator at the Grand Avenue Club, Meverden, testified that Holmes had trouble with the rigorous physical activity necessitated by working as a cleaner and often had to sit down while working. (Tr. 475.) She further stated, "[Holmes] also appeared to be winded and we worried that the job was too physical." (*Id.*) And yet the ALJ relied on the VE's opinion that Holmes could perform this exact job. Doing so demonstrates that the ALJ did not properly consider the impact of Holmes's obesity on his limitations.

"If the ALJ thought that [the claimant]'s obesity has not resulted in limitations on [his] ability to work, he should have explained how he reached that conclusion." *Arnett*, 676 F.3d at 593. Although the ALJ did provide some explanation, citing the fact that Holmes walks to the library, that fact does not support the conclusion that Holmes's obesity has not impacted his ability to work or that the ALJ properly considered the impact of his obesity. Accordingly, it was error for the ALJ to not properly consider Holmes's obesity and its impact on his ability to work.

### 4.3.3. Holmes's Statements

Holmes further argues that "the ALJ failed to even acknowledge [his] testimony about his difficulty sustaining prolonged sitting and standing." (ECF No. 13 at 19.) Holmes testified that he can stand for "probably not even five or [ten] minutes" and sit for about an hour before needing to get up. (Tr. 41.) On a claimant questionnaire he filled out for the Social Security Administration, Holmes stated he could only stand for three to five minutes and sit for twenty to thirty minutes. (Tr. 245.)

"[A claimant's] subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record," *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citing *Carradine v. Barnhart*, 360 F.3d 751, 764 (7th Cir. 2004) (Coffey, J., dissenting)), but the claimant's own testimony is still considered evidence, *see Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011). Dr. Fuhr opined that Holmes could sit for four to six hours and stand/walk for two hours in an eight-hour workday. (Tr. 348.) Given that the objective medical evidence in the record regarding his sit/stand requirements was not nearly as limiting as Holmes's subjective statements, the ALJ did not err in not discussing Holmes's own statements. *See Green v. Saul*, No. 19-1192, 2019 WL 3297472, at *4 (7th Cir. July 23, 2019) ("[A]n ALJ need not discuss every piece of evidence in the record."); *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) ("There is no presumption of truthfulness for a claimant's subjective complaints; rather, an ALJ should rely on medical opinions

based on objective observations and not solely on a claimant's subjective assertions.")

(citing *Rice v. Barnhart*, 384 F.3d 363 at 371 (7th Cir. 2004)).

### 4.3.4. Hypothetical to VE

Holmes argues that the ALJ failed to incorporate all of Holmes's physical limitations in his hypothetical questions posed to the VE. (ECF No. 13 at 21.) The Court of Appeals for the Seventh Circuit has held that "[h]ypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) (emphasis in original and internal citations omitted); *see Yurt*, 758 F.3d at 857. "The reason for [this] rule is to ensure that the vocational expert does not refer to jobs the [claimant] cannot work because the [vocational] expert did not know the full range of the [claimant's] limitations." *Steele*, 290 F.3d at 942. "An exception therefore exists for cases in which the vocational expert independently learned of the limitations (through other questioning at the hearing or outside review of the medical records, for example) and presumably accounted for them." *Id.*

In his RFC determination the ALJ found that Holmes "cannot climb ladders, ropes, or scaffolds." (Tr. 24.) However, in his hypothetical to the VE, the ALJ stated that the hypothetical individual "could only occasionally climb ladders, ropes or scaffolds." (Tr. 51.) Holmes argues that "[w]ith no VE testimony on the issue, it is unclear if an individual who was unable to climb ladders, ropes, or scaffolds could sustain the jobs identified at

the hearing." (ECF No. 13 at 21.) The Commissioner argues that "[w]hen a job requires climbing or using ladders, ropes, or scaffolds, the DOT job description mentions it," (ECF No. 18 at 17), and "[h]ere, none of the DOT job descriptions for the three representative positions that the vocational expert identified—cleaner, hand packager, and molding machine operator—mention any use of ladders, ropes, or scaffolds" (*Id.* at 17-18).

While there is no explicit mention of using a ladder, rope, or scaffold in the job descriptions, it is not entirely clear that these jobs would never require their use. As Holmes argues in reply,

> The DOT also states that someone with the job number identified by the VE may perform any of the duties as set forth in the DOT's "master title" of cleaner. The DOT's master title definition of cleaner describes the following duties: dusting furniture and equipment; polishing metal work; washing walls, ceiling, and woodwork; washing windows, door panels, and sills; and replacing light bulbs. It is possible that in order to clean these structures and replace light bulbs, a cleaner would have to climb ladders, ropes, or scaffolds. A hand packager packs products into cartons, and carries them to storage areas. A hand packager could, at least occasionally, require the use of a ladder or scaffold to reach the storage areas. Finally, a machine tender tends to machines, starts them, and cleans them. It is possible, again, that these duties may require the employee to climb structures like ladders. With no testimony from the VE on whether these jobs would require climbing of ladders, ropes, and scaffolds, whether Mr. Holmes could perform these jobs pursuant to the RFC assessment requires speculation.

(ECF No. 20 at 9 (footnotes omitted).)

Given the ALJ's determination that Holmes cannot climb ladders, ropes, or scaffolds, it was error to omit this limitation in his hypothetical to the VE. On remand,

the ALJ should ask the VE about a hypothetical person who could not climb ladders, ropes, or scaffolds.

### 4.3.5.  Medium Level Work

Holmes argues that "[t]he ALJ failed to properly explain how he determined that [Holmes] could sustain medium level work, and did not identify any medical opinion to support this RFC finding." (ECF No. 13 at 20.) The Commissioner argues that Holmes's "robust activities," such as doing chores, walking to the library, driving, using public transportation, and going to doctor's appointments support a medium level work range. (ECF No. 18 at 15-16.) Even though the court disagrees with the conclusion that these are "robust activities," the three jobs identified by the VE all required only light work. (Tr. 28.) Accordingly, any error by the ALJ was harmless.

### 4.4. Symptom Evaluation

In making his RFC determination the ALJ must engage in a two-step process to evaluate a claimant's symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304 at *3; *see also* 20 C.F.R. § 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to

perform work-related activities.…" SSR 16-3p, 2017 WL 5180304 at *3. The ALJ's evaluation of a claimant's symptoms is entitled to "special deference" and will not be overturned unless it is "patently wrong." *Summers*, 864 F.3d at 528 (citing *Eichstadt v. Astrue*, 534 F.3d 663, 667-68 (7th Cir. 2008)).

The ALJ stated,

> After careful consideration of the evidence, the undersigned finds that [Holmes]'s medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Holmes]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 26.) After reciting this boilerplate language, the ALJ explained,

> There was little evidence of record regarding physical limitations for [Holmes]. [Holmes] has diabetes and he is obese, but he still reported activities, such as working as a cleaner and walking to the library that demonstrated he was capable of physical activity. At one point, [Holmes] reported chest pain, but it was not worsened by his rigorous cleaning activity, and he denied any shortness of breath. Therefore, the undersigned finds [Holmes] is capable of medium work.

> Mentally and physically, [Holmes] has a significant, competitive work history at several different jobs. He lost his job at a law firm when his position was eliminated, and he worked as a personal care aide for his girlfriend until her death. Most recently, he was assigned to work through a work assistance program. He stated on days that he did not work he would walk to the library to read or use the computers. [Holmes] was diagnosed with depression, but it appeared at least somewhat in reaction to his long-term girlfriend passing away. He was also diagnosed with personality disorder with strong dependent traits, which the undersigned considered in limiting [Holmes] to simple, routine tasks with simple interactions.

(Tr. 26.)

While an ALJ looks to "daily activities" to evaluate a claimant's symptoms, 20 C.F.R. § 404.1529(c)(3)(i), he must be careful to not assume that, just because a claimant does an activity in daily living, he can perform strenuous tasks at work. *See Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("[The Court of Appeals for the Seventh Circuit has] cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home.") (citing *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005); *Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005); *Kelley v. Callahan*, 133 F.3d 583, 588-89 (8th Cir. 1998); *Smolen v. Chater*, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996)). Being able to walk a half block to the library does not equate with being capable of performing medium level work. And even though Holmes did have prior work experience as a cleaner and a scanner, Meverden testified that he became "winded" while cleaning (Tr. 475), and Holmes alleged he would be so tired after his four hour shift as a scanner that he would sleep all afternoon (Tr. 45).

Accordingly, on remand the ALJ shall reconsider whether Holmes's medically determinable impairments could reasonably be expected to cause his alleged symptoms and, if so, the ALJ shall reevaluate the intensity, persistence, and limiting effects of those symptoms.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 20th day of February, 2020.

WILLIAM E. DUFFIN
U.S. Magistrate Judge